# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| In re HARRIS FRC CORPORATION | ) | |
| MERGER AND APPRAISAL | ) | C.A. No. 2019-0736-JTL |
| LITIGATION | ) | |

## OPINION ADDRESSING PLAINTIFFS' MOTION TO COMPEL

Date Submitted: January 18, 2024
Date Decided: February 19, 2024

Joel Friedlander, Christopher M. Foulds, David Hahn, FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; *Counsel for Petitioner/Plaintiff Timothy J. Harris.*

S. Michael Sirkin, R. Garrett Rice, Dylan T. Mockensturm, ROSS ARONSTAM & MORITZ LLP, Wilmington Delaware; Gregory Lomax, LAULETTA BIRNBAUM, Sewell, New Jersey; Jill Guldin, PIERSON FERDINAND LLP, Princeton, New Jersey; *Counsel for Petitioners/Plaintiffs Kristen C. Harris and Megan Harris Loewenberg.*

Steven L. Caponi, Matthew B. Goeller, Megan E. O'Connor, K&L GATES LLP, Wilmington, Delaware; *Counsel for Respondents/Defendants Mary Ellen Harris, Paul Petigrow, and Michael Schwager.*

Kurt M. Heyman, Patricia L. Enerio, Gillian L. Andrews, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; *Counsel for Respondents/Defendants Royce Management, Inc., Judith Lolli, and Charles Grinnell.*

**LASTER, V.C.**

Relying on their status as New Jersey lawyers, two defendants self-collected their documents, self-reviewed the collected documents for responsiveness and privilege, and self-withheld what they thought warranted withholding. They refused to prepare privilege logs. They rejected reasonable requests for information about what they did. They even refused to provide information about their self-directed processes to their own Delaware litigation counsel.

The lawyer-defendants maintain that under New Jersey Rule of Professional Conduct 1.6, they cannot disclose any client-related information, including their clients' identities. They say that under New Jersey law, their ethical obligations trump the discovery rules.

The plaintiffs ask the court to appoint a neutral to review the self-withheld documents. After contending through oral argument that not even the court could review their documents *in camera*, the lawyer-defendants belatedly abandoned that position. They persist in asserting that no one else can review their documents, including a court-appointed neutral.

This decision holds that the lawyer-defendants must produce the withheld documents for *in camera* review. New Jersey Rule 1.6 is not unique. Like other jurisdictions across the country, New Jersey modeled its ethical rules on the American Bar Association's Model Rules of Professional Conduct. Courts hold consistently that Rule 1.6 imposes a general obligation of confidentiality that does not inhibit discovery in litigation. The attorney-client privilege and the work-product

doctrine may provide grounds for a client or its counsel to resist producing information in discovery; the ethical duty of confidentiality does not.

The lawyer-defendants build an argument for Garden State exceptionalism from a single court ruling. They read too much into that case. But even on its own terms, that decision allows a court to determine that counsel must produce confidential information in a particular case. This case warrant such a ruling.

Contrary to the lawyer-defendants' position, this court can appoint a special magistrate as an arm of the court to conduct the *in camera* review. Many decisions have done that.

To ensure that the lawyer-defendants and their clients enjoy the maximum protection possible, the court orders under Rule 510(f) that the submission of documents to the special magistrate does not waive any privilege. That would be true in any event, but this decision confirms it.

This decision charges the special magistrate with producing a list containing abbreviated information about the lawyer-defendants' communications in unrelated matters and a privilege log for the lawyer-defendants' communications in related matters. Exercising its authority under Rule 510(f), the court orders that the production of those materials does waive any privilege either.

## I. FACTUAL BACKGROUND

The facts are drawn from the parties' submissions on the motion to compel. Given the procedural posture, this decision does not make findings of fact. Instead, the following summary provides background for purposes of the discovery ruling.

## A.    The Company

Before May 2016, Harris FRC Corporation (the "Company") was a New Jersey corporation. From May 2016 until May 2019, the Company was a Delaware corporation. Since May 2019, the Company has been a New Jersey corporation.

The Company is a family-held entity. Dr. Robert M. Harris, Sr., founded the Company after securing a patent for an epilepsy drug. He licensed the patent to a global pharmaceutical company and formed the Company to receive the royalty payments of around $100 million per year.

Dr. Harris and his wife, Mary Ellen Harris, originally owned all of the Company's shares. In 2002, they transferred 38 shares to each of their five children (the "Siblings"). The plaintiffs are three of the Siblings: Dr. Timothy J. Harris, Kristen Harris, and Megan Harris Loewenberg.[1]

In 2011, Dr. Harris and Mary Ellen each created a trust and funded it with 245 shares. The trusts would expire on December 31, 2018, and distribute the shares to the Siblings. Through the 190 shares they received directly and the 490 shares distributed from the trusts, the Siblings would receive a total of 680 shares, representing a controlling 68% interest in the Company.

---

[1] My standard practice is to identify individuals by their last name without honorifics. When individuals share the same last name, my standard practice is to shift to first names. This decision uses first names for the members of the Harris family, except for Dr. Robert M. Harris. He has a son with the same name, so this decision refers to the father as "Dr. Harris" and the son as Robert.

**B.      Dr. Harris's Illness**

In late 2013, Dr. Harris was diagnosed with Alzheimer's disease. The plaintiffs contend that as his mental health deteriorated, Judith Lolli insinuated herself into Mary Ellen's financial life. The defendants have stipulated that Mary Ellen and Lolli are such close friends that Mary Ellen is not disinterested or independent where Lolli is concerned.

Lolli brought Mary Ellen into contact with her own friends and advisors. Paul Petigrow is a New Jersey lawyer who served as Lolli's personal counsel. Petigrow promptly became Mary Ellen's personal counsel. Charles Grinnell is a New Jersey lawyer and career prosecutor who investigated and prosecuted the gangland murder of Lolli's brother, then became her close friend. Michael Schwager is Lolli's personal accountant and another close friend. This decision refers to Lolli, Petigrow, Grinnell, and Schwager collectively as the "Advisors."

**C.      The Takeover**

With Dr. Harris's health failing, questions arose as to who would lead the Company. A power struggle ensued with Mary Ellen and the Advisors on one side and Robert M. Harris, Jr., the oldest Sibling, on the other. In April 2015, eighteen months after his Alzheimer's diagnosis, Dr. Harris purportedly acted by written consent to remove Robert from his positions with the Company. The written consent added Mary Ellen to the board of directors (the "Board"), where Dr. Harris had been the sole director. The plaintiffs question how Dr. Harris could have had the capacity to execute the written consent.

4

In June 2015, Mary Ellen signed an employment agreement which provided Lolli with compensation in an amount to be determined at a future date. The Company began paying Lolli $15,000 annually and providing her with benefits. The Company retained Grinnell as a consultant. Schwager took over as the Company's accountant. Petigrow began doing legal work for the Company.

In late summer 2015, Lolli and Grinnell formed Royce Management Corporation ("Royce") as a vehicle for providing management services to the Company. In October, the Company began paying Royce $208,000 a month. Mary Ellen subsequently approved a management services agreement that paid Royce $208,334 per month, provided for an annual fee escalator of 3.5%, and renewed automatically every year. The Company and Royce have amended the agreement twice, each time making it more favorable to Royce. In addition to Royce's monthly fee, Mary Ellen has approved large bonuses for Royce. In total, Royce received over $20 million from the Company between October 2015 and December 2020.

### D.    Dr. Harris's Trust

To maintain control over the Company, Mary Ellen and the Advisors had to deal with the trusts. If the trusts distributed 480 shares to the Siblings, then control over the Company would pass to them.

Around the same time that the Company began paying Royce, Lolli served as a witness when Dr. Harris purportedly amended his trust. Petigrow oversaw the drafting of the documents. The amendment redirected the 245 shares in Dr. Harris's trust to a different trust that benefitted Mary Ellen. The transaction reduced the

5

number of Shares that the Siblings would receive from 680 to 435, below majority control.

**E.     The Inbound Merger**

It was readily apparent that Robert might sue over his ouster from the Company. Believing Delaware law would give them greater protection, Mary Ellen and the Advisors started working on a merger that would move the Company to Delaware (the "Inbound Merger").

In November 2015, Petigrow drafted a letter of resignation that Dr. Harris purportedly signed, two years after his Alzheimer's diagnosis. His resignation left Mary Ellen as the sole director. Petigrow drafted a power of attorney in which Dr. Harris empowered Mary Ellen to act on his behalf. Dr. Harris purportedly signed it, and Lolli witnessed it. Petigrow also drafted proxies that Mary Ellen could use to vote Dr. Harris's shares.

On December 7, 2015, Petigrow and Mary Ellen formed a Delaware corporation for use in the Inbound Merger. That same month, Petigrow wrote to the Siblings to explain why the Company was moving to Delaware. After that, Grinnell decided that the Company would not provide any more information to stockholders, citing Robert's threat of a lawsuit.

**F.     More Money For Petigrow**

In February 2016, Mary Ellen approved a new employment agreement for Petigrow that paid him $600,000 per year to serve as the Company's General Counsel. Petigrow continued to run a solo law practice out of the Company's offices, using the Company's personnel and resources, all without paying rent.

6

In March 2016, Lolli had a physician friend declare Dr. Harris incapacitated. Petigrow drafted the physician's certificate.

On May 1, 2016, the Inbound Merger became effective. Believing they had greater protection under Delaware law, Mary Ellen and the Advisors used Company funds to pay for an array of personal expenses.

In April 2017, Dr. Harris died. The shares that would have gone to the Siblings passed to the trust that Mary Ellen controlled.

## G. The Share Withdrawal

During the second half of 2018, Mary Ellen and the Advisors engaged in two transactions designed to preserve their control over the Company. First, they settled with Robert. Next, they withdrew the shares from the trust Mary Ellen had created to benefit the Siblings (the "Share Withdrawal").

According to the plaintiffs, the Advisors engineered a transaction in which Mary Ellen withdrew the shares at a lowball price. Grinnell and Lolli oversaw the transaction. Petigrow coordinated the legal work and commissioned the appraisal. Schwager worked on the financial side.

## H. Timothy Hires Counsel And Asks Questions.

Meanwhile, Timothy, Kristen, and Megan had become concerned about events at the Company They began asking questions.

On April 10, 2019, Timothy's counsel attended the Company's annual meeting. Petigrow chaired the meeting. Grinnell attended but refused to identify himself. Before the meeting was adjourned, Timothy's counsel asked for a report on the

Company, then followed up with specific questions. Petigrow and Grinnell failed to provide substantive answers on numerous topics.

## I.    The Outbound Merger

With Timothy having retained a Delaware lawyer, the Advisors anticipated that a demand for books and records would be coming soon. They immediately started working on a plan to take the Company back into New Jersey (the "Outbound Merger"). They believed that New Jersey's law on books and records was more favorable, and they also thought that the Outbound Merger would cut off the Siblings' standing to assert derivative claims regarding events predating the merger.

On May 6, 2019, Timothy sent the Company a written demand for books and records. The Outbound Merger became effective on May 17, 2019.

## J.    This Litigation

The Outbound Merger stymied Timothy's attempt to seek books and records under Delaware law, but it opened up another informational avenue. He sought appraisal for one share of Company common stock. In discovery, he sought the information that a books-and-records inspection would have generated.

Just weeks after Timothy petitioned for appraisal, Grinnell and Petigrow amended Petigrow's employment agreement. The amendment extended the contract term through December 31, 2022, allowed Petigrow to terminate the agreement for good reason, and provided for a change of control payment triggered by a sale of assets. Within a week after executing that document, the Company began a process to sell its patent rights—the Company's only asset. In July 2020, the Company agreed to sell its royalty stream for $342 million in cash.

**K.    The Claims**

In September 2021, Timothy filed an amended petition and complaint that added plenary claims for breach of fiduciary duty against Mary Ellen and the Advisors, plus claims in the alternative for aiding and abetting against the Advisors. In November, Kristen and Megan joined the case as additional plaintiffs. In March 2022, the plaintiffs filed the currently operative complaint (the "Complaint").

Count I of the Complaint asserts that Mary Ellen has breached her fiduciary duties as President, sole director, and controlling stockholder of the Company. Count III asserts claims for breach of fiduciary duty against the Advisors in their capacity as officers and agents. Count IV alleges in the alternative that to the extent the Advisors are not liable for breaching their own duties as fiduciaries of the Company, both they and Royce aided and abetted the breaches of fiduciary duty by Mary Ellen, Petigrow, and any other Advisor that is found to have owed fiduciary duties.

In substance, the breach of fiduciary duty claims challenge a range of transactions in which Mary Ellen and the Advisors extracted funds from the Company. Those transactions include payments to Mary Ellen and the Advisors. They also include payments to entities related to Mary Ellen and the Advisors. The plaintiffs allege, among other things, that the amounts paid to the Mary Ellen, the Advisors, and their affiliates were unfair to the Company.

Counts II and V address the Share Withdrawal. Count II asserts that Mary Ellen breached the trust instrument governing her trust by failing to pay reasonably equivalent value in the Share Withdrawal. Count V asserts that Lolli, Grinnell, Petigrow, Schwager, and Royce tortiously interfered with the trust instrument.

9

**L.     Problems In Discovery**

Discovery has been difficult and contentious. In March 2021, after serious problems with the Company's production, the court appointed Ryan P. Newell as a discovery facilitator (the "Discovery Facilitator"). The parties met and conferred with the Discovery Facilitator to develop a discovery plan, but they could not even agree on that. The Discovery Facilitator proposed a plan that included the parties' competing positions on various issues.

During this period, Grinnell and Petigrow were not yet named as defendants. Timothy identified them as non-parties who were likely to have relevant information, and the Company identified them as likely document custodians.

Petigrow and Grinnell are New Jersey attorneys, and they relied on their status as lawyers to resist discovery. They invoked New Jersey Rule of Professional Conduct 1.6, under which a lawyer has an obligation to maintain the confidentiality of client information. They assert that Rule 1.6 prevents them from producing anything in discovery that could reveal information about any clients who have not consented to disclosure. Mary Ellen and the Company have consented, but none of their other clients has.

Because of their status as New Jersey attorneys, Grinnell and Petigrow refused to let anyone else participate in collecting or reviewing their documents. They insisted on self-collecting their documents, self-reviewing the documents for responsiveness and privilege, and self-withholding what they believed was nonresponsive or privileged. They refused to provide any information about what they withheld and would not produce privilege logs.

10

Both Timothy and the Discovery Facilitator had doubts about the sufficiency and transparency of that process. When the court approved the discovery plan, the court added language ordering Petigrow to run search terms and produce a hit report that could serve as a high-level, back-end check on what he had withheld.

Petigrow reported that he self-withheld 1,788 documents. The hit report indicated that at least 1,117 documents relate to Lolli, 359 to Grinnell, and 322 to Mary Ellen. The hit repot thus showed that the vast majority of the documents Petigrow withheld related to either Mary Ellen or the Advisors and not to unrelated matters.

Obtaining additional information from Grinnell was more difficult. To pursue his appraisal claim, Timothy sought discovery from Lolli and Grinnell through the Company. Timothy argued that the management agreement made Royce an agent of the Company and subject to its control for purposes of discovery. Because Lolli and Grinnell were the principals of Royce, the Company could be ordered to produce any Company-related documents that they possessed. To cut off that route to discovery, the Company and Royce terminated the management agreement. That transaction resulted in a large payment to Royce. It also meant that Lolli and Grinnell could claim that they were no longer agents of the Company. The court therefore included language in the discovery plan requiring that the Company provide search strings to Grinnell and ask him to run them and provide a hit report.

Grinnell delayed running the searches and eventually refused. He later reported that he self-withheld 2,267 documents. It seems likely that a hit report for his documents would show results similar to Petigrow's report.

The plaintiffs regard Petigrow and Grinnell's productions as highly suspect. They produced approximately 800 responsive emails from a period when they supposedly were working full time for the Company. Yet they withheld over 4,000 documents—five times that number—generated during the same period because they supposedly involve work for other clients on unrelated matters. And Petigrow's hit report reveals that a majority of the documents he withheld involve Mary Ellen or the Advisors.

In 2021, Timothy added Grinnell and Petigrow as defendants. Relying on their status as New Jersey lawyers, Grinnell and Petigrow continued to resist discovery. To this day, Grinnell and Petigrow have refused to allow their own Delaware litigation counsel to review any of the documents that they withheld. They also have refused to produce privilege logs to support their assertions of privilege. Grinnell continues to refuse to conduct any back-end testing using search terms.

## M. The Motion To Compel

In December 2023, after Kristen and Megan had joined the case, the plaintiffs filed a motion to appoint a neutral to review the documents that Petigrow and Grinnell withheld. The plaintiffs argue that many of the withheld documents are likely relevant to their claims against the Company and the Advisors.

The plaintiffs believe that the withheld documents will provide direct evidence of how Mary Ellen and the Advisors extracted value from the Company. They point

out that Petigrow's hit report shows the vast majority of the withheld documents relate to Mary Ellen or the other Advisors, and they infer that Petigrow is withholding relevant documents under the guise of confidentiality and privilege. They believe Grinnell is pulling the same stunt, and likely to a greater degree because he has refused to generate a hit report.

The plaintiffs believe that regardless of whether the withheld documents provide direct evidence of wrongdoing, the nature and volume of the withheld documents will provide indirect support for their claims. They argue that Petigrow and Grinnell received large sums of money from the Company as compensation for services, and a key factor in determining whether those amounts were fair will be what Petigrow and Grinnell did for the Company in exchange. The plaintiffs believe that Petigrow and Grinnell spent much of their time working for other clients on matters that did not benefit the Company (the "Other Matters").

The Other Matters fall into two buckets. The first bucket consists of work for Mary Ellen and the Advisors in their personal capacities ("Related-Party Work"). For example, the plaintiffs assert that Mary Ellen and the Advisors created a web of entities for non-Company related ventures such as a farm that Mary Ellen and Lolli co-own, other real estate ventures that Mary Ellen and Lolli have pursued, and other businesses that Lolli has invested in or operates. The plaintiffs assert that Petigrow and Grinnell have done work for those ventures on the Company's dime. They want to know the names of the clients who Petigrow and Grinnell were representing so they can assess how much Related-Party Work they were doing. They also want to

13

assess whether to seek the production of documents relating to matters involving Related-Party Work. The plaintiffs contend that the purportedly privileged Related-Party Work may turn out not be privileged.

The second bucket consists of work for other clients who were legitimate third parties ("Unrelated-Party Work"). For example, Grinnell has represented that he acted as *pro bono* counsel for some criminal defendants in matters wholly unrelated to the Company, the Advisors, or this case. The plaintiffs have no interest in the substance of the Unrelated-Party Work. They want to distinguish between the Unrelated-Party Work and the Related-Party Work, then gain a sense of the magnitude of the Unrelated-Party Work and the Related-Party Work. They posit that if Petigrow and Grinnell spent significant time on Unrelated-Party Work, then the Company should not have been paying them for full time work.

Petigrow and Grinnell maintain that as New Jersey lawyers, they cannot provide any information about the Other Matters. From their perspective, the duty of confidentiality is so extreme that they cannot even provide the names of the clients they represented. During briefing and argument, they maintained that they could not provide any information about the Other Matters to the court.

Based on this extreme position, Petigrow and Grinnell have not shared any information about the Other Matters with their Delaware litigation counsel. That resulted in odd submissions and an even stranger hearing, during which Petigrow and Grinnell's Delaware counsel had to repeatedly disavow any knowledge of the underlying documents and were therefore unable to respond to the court's questions.

14

## II. LEGAL ANALYSIS

The plaintiffs ask to have a neutral review the documents that Petigrow and Grinnell have withheld. The plaintiffs contend that Petigrow and Grinnell cannot rely on their duty of confidentiality under New Jersey Rule 1.6 to withhold documents or information from discovery. They also say that to the extent Petigrow and Grinnell have invoked the attorney-client privilege, they have not produced a privilege log and cannot support their privilege assertions. They want the neutral to review the documents that relate to the Other Matters.

Petigrow and Grinnell argue that they cannot so much as log privileged documents because of their duty of confidentiality under New Jersey Rule 1.6. The plaintiffs respond that Rule 1.6 does not prohibit a client from consenting to disclosure. Because it is undisputed that Petigrow and Grinnell performed work for Mary Ellen, Lolli, and Royce, the plaintiffs say Petigrow and Grinnell should have no problem logging at least those documents. More importantly, say the plaintiffs, Rule 1.6 does not protect a lawyer from responding to discovery in litigation.

Resolving the plaintiffs' motion requires understanding the difference between a lawyer's general duty of confidentiality and the more specific evidentiary protections embodied in the attorney-client privilege and the work product doctrine. All are matters of state law. The plaintiff contends that Delaware law governs the motion. Petigrow and Grinnell contend that New Jersey governs the motion. This decision assumes that New Jersey law applies and therefore relies primarily on New Jersey authorities.

15

**A.     The Distinctions Between The Duty Of Confidentiality And Evidentiary Protections**

Although the concepts are often discussed together, the duty of confidentiality differs from evidentiary protections like the attorney-client privilege and work product doctrine. The former is a broad, ethical duty that applies to any client-related information. The latter are specific, evidentiary protections that enable a lawyer or client to resist producing specific types of client-related information.

A lawyer's ethical duty of confidentiality is a broad, affirmative duty not to disclose information relating to the representation of a client, subject to specific exceptions. New Jersey has codified the ethical obligation of confidentiality in Professional Conduct Rule 1.6. That rule states, in relevant part: "A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for . . . as stated in paragraphs (b), (c) and (d)."[2]

By its terms, Rule 1.6 imposes a general duty of confidentiality that a lawyer must observe. As the New Jersey Supreme Court has explained, "[t]he ethics rules generally forbid disclosure of client information, without the client's consent, unless one of the exceptions to the rule is available."[3] Exceptions (b) and (c) deal with situations in which disclosure is necessary

> to prevent the client or another person: (1) from committing a criminal, illegal or fraudulent act that the lawyer reasonably believes is likely to result in death or substantial bodily harm or substantial injury to the

---

[2] N.J. Rules Prof'l Conduct R. 1.6.

[3] *In re Advisory Opinion No. 544 of New Jersey Supreme Ct. Advisory Comm. on Pro. Ethics*, 511 A.2d 609, 613 (N.J. 1986).

16

financial interest or property of another; or (2) from committing a criminal, illegal or fraudulent act that the lawyer reasonably believes is likely to perpetrate a fraud upon a tribunal."[4]

Under exception (b), a lawyer "shall reveal such information to the proper authorities, as soon as, and to the extent the lawyer reasonably believes necessary" to prevent either situation from occurring.[5] Exception (c) permits a lawyer who discloses information under exception (b) to also "reveal the information to the person threatened to the extent the lawyer reasonably believes is necessary to protect that person from death, substantial bodily harm, substantial financial injury, or substantial property loss."[6]

Exception (d) is also permissive. It authorizes a lawyer to disclose information "to the extent the lawyer reasonably believes necessary . . . to comply with other law."[7]

The text of New Jersey Rule 1.6 is not unique. The Garden State modeled its rule on Rule 1.6 of the American Bar Association's Model Rules of Professional Conduct. The official commentary to Rule 1.6 explains the interrelationships among the bodies of law that govern confidentiality:

> The principle of client-lawyer confidentiality is given effect by related bodies of law: the attorney-client privilege, the work product doctrine and the rule of confidentiality established in professional ethics. The attorney-client privilege and work product doctrine apply in judicial and other proceedings in which a lawyer may be called as a witness or

---

[4] N.J. Rules Prof'l Conduct R. 1.6(b).

[5] *Id.*

[6] *Id.* R. 1.6(c).

[7] *Id.* R. 1.6(d).

17

otherwise required to produce evidence concerning a client. The rule of client-lawyer confidentiality applies in situations other than those where evidence is sought from the lawyer through compulsion of law. The confidentiality rule, for example, applies not only to matters communicated in confidence by the client but also to all information relating to the representation, whatever its source. A lawyer may not disclose such information except as authorized or required by the Rules of Professional Conduct or other law.[8]

As this comment notes, the ethical obligation of confidentiality "applies in situations other than those where evidence is sought from the lawyer through compulsion of law." The attorney-client privilege and work product doctrine, not Rule 1.6, apply in litigation.

Every jurisdiction in the United States has adopted some version of Rule 1.6. Consistent with the commentary to the Model Rule, authorities uniformly acknowledge that while Rule 1.6 imposes a general obligation of confidentiality, "[a] lawyer's general legal duty not to use or disclose confidential client information (see § 59) is superseded when the law specifically requires such use or disclosure."[9]

The obligation to participate in discovery is one situation where the law specifically requires disclosure. Courts from jurisdictions across the country have held that Rule 1.6 does not inhibit discovery in a judicial proceeding.[10] After

---

[8] Model Rules of Pro. Conduct R. 1.6 cmt. 3 (Am. Bar Ass'n 2023).

[9] Restatement (Third) of the Law Governing Lawyers § 63 cmt. a. (Am. L. Inst. 2000).

[10] *Avoletta v. Danforth*, 2012 WL 3113151, at *1 (D. Conn. Jul. 31, 2012) ("Rule 1.6 is not intended to, and does not apply to judicial proceedings in which a lawyer may be required to produce evidence concerning a client."); *Hope For Fams. & Cmty. Serv., Inc. v. Warren*, 2009 WL 174970, at *32 (M.D. Ala. Jan. 26, 2009) ("The commentary to Rule 1.6 is illuminating; it provides that '[t]he attorney client privilege

surveying the case law, the United Stated District Court for the Middle District of Louisiana explained that "Rule 1.6(6) specifically allows privileged material to be disclosed to comply with a law or court order. Indeed, multiple district courts addressing nearly identical Rules of Professional Conduct have held that Rule 1.6 does not preclude an attorney from producing evidence in a judicial proceeding."[11] The United States District Court for the District of Minnesota likewise held that Rule 1.6 did not give attorneys grounds to refuse to produce a privilege log or respond to discovery, writing: "[The party's] reliance upon Rule 1.6 to not produce a privilege log and to not answer discovery questions is misplaced. . . . Rule 1.6 applies in situations other than those where evidence is sought from a lawyer through compulsion of law . . . . Rule 1.6 is inapplicable to discovery requests and deposition questions."[12]

The attorney-client privilege and work-product protection are different. Rather than imposing a general obligation of confidentiality on the lawyer, those evidentiary doctrines permit the client or the lawyer to withhold information from discovery. New

---

applies in judicial and other proceedings in which a lawyer may be called as a witness or otherwise required to produce evidence concerning a client. The rule of client-lawyer confidentiality applies in situations *other than those where evidence is sought from the lawyer through compulsion of law*."") (citing Ala. Rules of Prof'l Conduct R. 1.6 cmt.) (emphasis in original); *see id.* at \*33 (collecting authorities).

[11] *Barback v. Fisher*, 2022 WL 965914, at \*6; *see id.* at n.40 (M.D. La. Mar. 30, 2022) (collecting cases).

[12] *Burke v. Messerli & Kramer, P.A.*, 2010 WL 2520615, at \*2 (D. Minn. June 15, 2010) (internal citations and quotations omitted).

Jersey Rule of Evidence 504 codifies the privilege.[13] New Jersey Court Rule 4:10-2(c) protects attorney work product.[14] New Jersey thus maintains the same doctrinal distinctions found in other jurisdictions.

In short, "[t]he attorney-client privilege and work product doctrine apply in judicial and other proceedings in which a lawyer may be called as a witness or otherwise required to produce evidence concerning a client."[15] The ethical obligation of confidentiality "applies in situations *other than* those where evidence is sought from the lawyer through compulsion of law."[16] Summarizing the case law, Maryland's highest court has framed the difference crisply:

> There is a critical distinction . . . between confidentiality required by ethical rules and the evidentiary basis of the attorney-client privilege. More protection is provided to communications within the attorney-client relationship under one than the other. The confidentiality umbrella of the ethical rule encompasses all situations *except* where the evidence is sought from the lawyer through compulsion of law. In the latter situation, only the attorney-client privilege, not the broader rule of confidentiality, protects against disclosure. Thus, relevant evidence sought through discovery, unless protected by the attorney-client privilege, must be produced and the ethical duty of confidentiality takes a back seat to the quest for truth.[17]

---

[13] N.J.S.A. § 28:84A-20; *see Dry Branch Kaolin Co. v. Doe*, 622 A.2d 1320, 1322–23 (N.J. Super. Ct. App. Div. 1993).

[14] N.J.R. 4:10-2.

[15] 173 Am. Jur. *Proof of Facts* 3d 289 § 3 (2019).

[16] *Id.* (emphasis added).

[17] *Parler & Wobber v. Miles & Stockbridge*, 756 A.2d 526, 536 (Md. 2000) (internal citations and quotation omitted).

When a party seeks discovery from a lawyer in litigation, the ethical duty of confidentiality does not override the legal requirement to produce evidence.

## B.  New Jersey's Supposedly Different Rule

Even though New Jersey Rule 1.6 tracks the Model Rule 1.6, Petigrow and Grinnell argue that New Jersey law takes a very different approach to the ethical duty of confidentiality. As they understand it, New Jersey Rule 1.6 applies in litigation *and* prevents a lawyer from disclosing any client-related information, including the client's name, unless a court finds that the needs of the case require it. The further assert that the standard for compelling disclosure of a client's name is a high one that cannot be met in this case.

As the centerpiece of their argument, Grinnell and Petigrow rely on a single *per curiam* decision from an intermediate New Jersey appellate court. In the *Evolution* case,[18] the defendants were an attorney and his law firm. Their client had prepared a report which asserted that the plaintiffs engaged in illegal gambling. The attorney sent the report to the New Jersey Division of Gaming Enforcement, and the media picked up the story.

The plaintiffs sued the attorney and the law firm for defamation. In discovery, the plaintiffs sought the client's identity so they could add the client as a defendant. The trial court ordered the defendant to provide the information.

---

[18] *Evolution AB (Publ.) v. Marra*, 288 A.3d 459 (N.J. App. Div. 2023) (*per curiam*).

The lawyer and law firm appealed, and New Jersey's intermediate court of appeals reversed. The plaintiffs defended the trial court's decision by citing the text of Rule 1.6. They do not seem to have presented other authority, because the *Evolution* decision does not cite, much less discuss, the commentary to Model Rule 1.6 or the numerous authorities holding that Rule 1.6 does not apply in litigation.

The plaintiffs also do not seem to have fully presented the New Jersey authorities the address the extent to which the attorney-client privilege can protect a client's identity. The *Evolution* decision cited only two decisions. One was a criminal case in which the Supreme Court of New Jersey held that the privilege protected the identity of a client who possessed information about an allegedly tainted jury verdict, asked an attorney to provide the information to the court, and specifically instructed the attorney not to reveal his identity.[19] The other was a later civil case that distinguished the criminal precedent before holding that the privilege did not protect the client's identify on the facts presented.[20] The *Evolution* court did not cite two earlier decisions from the Supreme Court of New Jersey which held that the attorney-client privilege does not generally protect a client's identity from discovery. The first decision held that "while the privilege protects against the disclosure of confidential communications from the client to his attorney it is not intended to permit

---

[19] *Evolution*, 288 A.3d at 462 n.5 (citing *In re Kozlov*, 398 A.2d 882, 885–86 (N.J. 1979) (holding that attorney was entitled to withhold client's identity when reporting information about allegedly tainted jury verdict)).

[20] *Id.* (citing *Dry Branch*, 622 A.2d at 1324 (discussing *Kozlov* before requiring disclosure of the client's identity)).

concealment by the attorney of the identity of his client."[21] Confronting the same issue a few years later, the justices surveyed jurisdictions across the country and found that "[t]he authorities are substantially uniform against any privilege as applied to the fact of retainer or identity of the client."[22]

The *Evolution* plaintiffs appear to have argued only that Rule 1.6(d) allowed for disclosures that a lawyer reasonably believed necessary "to comply with other law" and that the trial court's discovery order constituted "other law." The *Evolution* court rejected that argument, reasoning that if

> the entry of any discovery order eclipses a lawyer's ethical obligations under RPC 1.6, it would not be long before RPC 1.6 would have no meaning at all. That a judge was convinced to enter a discovery order is not the test; there must be a sufficient legal or policy-driven reason underlying the "other law" provision before a disclosure of the client's information may be compelled.[23]

---

[21] *State v. Toscano*, 100 A.2d 170, 173 (N.J. 1953).

[22] *In re Richardson*, 157 A.2d 695, 699 (N.J. 1960); *see also Gannet v. First Nat'l State Bank of N.J.*, 410 F.Supp. 585, 588 (D.N.J. 1976) (The [attorney-client] privilege does not embrace the client's identity."), *rev'd on other grounds sub nom.* 540 F.2d 619 (3d Cir. 1976). Courts in other jurisdictions agree. *E.g.*, *Cesena v. Du Page Cnty.*, 558 N.E.2d 1378, 1383–85 (Ill. App. Ct. 1990) ("The general rule in Illinois is that a client's identity is not protected under the attorney-client privilege,"), *rev'd on other grounds*, 582 N.E.2d 177 (Ill. 1991), *cert. denied sub nom. Fawell v. Cesena*, 504 U.S. 915 (1992); *Chaudhry v. Gallerizzo*, 174 F.3d 394, 402–03 (4th Cir. 1999) ("[T]he identity of the client, the amount of the [attorneys'] fee, the identification of payment by case file name, and the general purpose of the work performed are usually not protected from disclosure by the attorney-client privilege.").

[23] *Evolution*, 288 A.3d at 462.

Again, no one appears to have brought to the *Evolution* court's attention the commentary to Model Rule 1.6 or the many authorities which explain that Rule 1.6 does not apply in litigation.

In holding that Rule 1.6 applied to discovery and protected a client's identity, the *Evolution* court relied on *Advisory Opinion No. 544,*[24] an ethics ruling issued by the Supreme Court of New Jersey that overruled an advisory opinion issued by its Ethics Advisory Committee. But as the *Evolution* court acknowledged, that opinion "dealt with quite a different circumstance."[25]

*Advisory Opinion No. 544* arose out of a request by a legal services organization that represented indigent and mentally disabled clients. Several of its funding sources were seeking detailed information about the services it provided to clients, including the clients' identities. The Supreme Court of New Jersey explained that "[t]he extent of the protection accorded communications and other information arising in the course of any attorney-client relationship is governed by the attorney-client privilege as well as several ethics standards."[26] That statement comports with the law in other jurisdictions as well. Notably, the New Jersey Supreme Court did not hold that both the privilege and ethical duties of confidentiality always apply in every scenario. Sometimes, both the duty of confidentiality and evidentiary doctrines

---

[24] *In re Advisory Opinion No. 544 of New Jersey Supreme Ct. Advisory Comm. On Pro. Ethics*, 511 A.2d 609 (1986).

[25] *Evolution*, 288 A.3d at 463.

[26] *In re Advisory Op. No. 544*, 511 A.2d at 612.

like the privilege or work product doctrine apply. Sometimes, only evidentiary doctrines apply.

> For purposes of the opinion, the justices held that

> under current standards governing attorney conduct, client-identity may not be disclosed to any private or public funding agency in the absence of appropriate consent or other legal justification. In so ruling, we determine that a client's identity constitutes information relating to the representation of a client under the current Rules of Professional Conduct and a secret entitled to non-disclosure, if not a protected confidential communication, under the attorney-client privilege.[27]

The justices expressly considered whether there was any law or regulation that required the legal services organization to disclose the clients' identities. The justices found none while acknowledging that such a requirement would control if it existed.[28]

The *Evolution* decision treated *Advisory Opinion No. 544* as establishing that Rule 1.6 applied to compelled disclosure through discovery in litigation, even though *Advisory Opinion No. 544* did not involve compelled disclosure or litigation. As noted previously, the *Evolution* court does not appear to have been presented with the great weight of authority which holds that Rule 1.6 does not apply to discovery in litigation.

For their part, the defendants argued that under Rule 1.6, a court could not order them to disclose their client's identity under any circumstances. The *Evolution* court rejected this "absolutist position" as "equally facile," reasoning that "somewhere

---

[27] *Id.* at 614.

[28] *Id.* at 614–15.

25

between the parties' polar-opposite positions lies a middle ground."[29] The court concluded that a balanced application should ensure that "the client's desire for anonymity does not entirely eviscerate another's valid cause of action," while also taking into account that a "civil claim may not be of sufficient weight to overcome the strong policy interests underlying RPC 1.6's general rule of nondisclosure."[30]

In searching for a middle ground, the *Evolution* court seems to have been motivated by the equities in the case. In addition to the court's concern about the lawyer's duty of confidentiality, the *Evolution* court also worried that the plaintiffs were seeking the identity of an "anonymous client [who] may be fairly viewed as a whistleblower seeking protection from the actions of a vindictive adversary."[31]

Confronted with this scenario, the *Evolution* court held that disclosure of a client's identity can be compelled in certain circumstances, and a court must determine whether disclosure is appropriate on the facts of the case, including by evaluating the significance of the information to the plaintiffs' claims and the risk of harm to the client. The court remanded the case for the trial court to make that determination. The court also instructed the trial court to "consider whether or to what extent information should be received and reviewed *in camera* as the means for

---

[29] *Id.*

[30] *Id.* at 463.

[31] *Id.*

best protecting the client's anonymity until a ruling on disclosure may be made."[32] By conducting *in camera* review, the court could determine whether the client was a whistleblower who deserved protection.

The *Evolution* decision is short and sweet. It is a *per curiam* opinion that has the feel of a fact-specific application of existing law. Nothing about the decision suggests a desire to send New Jersey law in a direction contrary to other jurisdictions. Yet as Petigrow and Grinnell read it, that is what the *Evolution* court did.

Given these considerations, there is good reason to think that the *Evolution* decision does not require applying Rule 1.6 in discovery. The opinions issued by the Supreme Court of New Jersey suggest that the proper framework for analyzing discovery issues is the attorney-client privilege, not Rule 1.6. Nevertheless, because the *Evolution* decision appears to be the most recent statement of New Jersey law on the applicability of Rule 1.6, this court will follow it.

By its terms, the *Evolution* case permits a court to compel the production of client identities if the facts of the case require it. Not only that, but the *Evolution* court permits a trial court to conduct *in camera* review to determine what information a lawyer should be compelled to provide. Perhaps in belated recognition that their lead authority contemplated *in camera* review, Petigrow and Grinnell abandoned their absolutist position that they could not even provide information to the court.

---

[32] *Id.* at 464.

Applied to this case, the *Evolution* decision does not counsel against disclosure. Grinnell and Petigrow's clients are not potential whistleblowers. The plaintiffs are not seeking the names of their clients so that they can sue them. The plaintiffs have no interest in the details of the Unrelated-Party Work, except to have a general understanding of how much time Grinnell and Petigrow spent on it. They have not asked for client identities or anything about the substance of the Unrelated-Party Work. They ask only to know the number of clients in that category and the number of communications with each client.

The plaintiffs seek more information about the Related-Party Work, but only information comparable to what would appear on a privilege log. At this stage of the case, no one disputes that Grinnell and Petigrow represented Mary Ellen and the Advisors, plus their affiliates. This is not a case where disclosing client identifies will reveal previously unknown individuals who could then be sued. Instead, that level of information is necessary for the plaintiffs to understand how many Related-Party Work matters there were, what those matters concerned, and how much time and effort Grinnell and Petigrow spent on that work.

Within the framework of the *Evolution* case, the identities of Grinnell and Petigrow's clients are not entitled to absolute protection. The court can compel Grinnell and Petigrow to provide discovery regarding their clients that is necessary and proportionate to the needs of this case.

## C. The Discovery To Which Plaintiffs Are Entitled

For the Unrelated-Party Work, the plaintiffs are entitled to know the number of clients that Grinnell or Petigrow represented. The plaintiffs are also entitled to

know the number of communications with each client and, for each communication, its date and the number of pages the communication comprised. The plaintiffs have not shown that more than that is necessary or proportional at this stage. On the facts of the case, Rule 1.6 does not protect this information from disclosure, even under the *Evolution* decision. The production of this information will not reveal any privileged information, so the attorney-client privilege does not apply either.

For the Related-Party Work, the plaintiffs are entitled to a privilege log. Under the *Evolution* decision, the facts of the case warrant ordering the production of this information. Not only that, but because all of the communications involve Mary Ellen or the other Advisors, the log will not reveal significant information about client identities. Here again, the production of this information will not reveal any privileged information, so the attorney-client privilege does not apply

Rule 1.6 does not protect that type of information from disclosure, and compliance with a court order is a recognized exception to the ethical obligation of confidentiality. Petigrow and Grinnell will not violate Rule 1.6 by complying with this decision.

## D. The Role Of A Neutral

The plaintiffs have proposed that a neutral conduct the *in camera* review. Although Petigrow and Grinnell now concede that the court could conduct the *in camera* review, they maintain that a neutral cannot.

This court has the power to appoint a special magistrate to review the documents *in camera*. In 1920, the United States Supreme Court held that "[c]ourts have . . . inherent power to provide themselves with appropriate instruments required

29

for the performance of their duties."[33] Federal Rule of Civil Procedure 53 subsequently codified that power.[34] The federal courts have construed the rule to supplement, rather than displace, their inherent authority to appoint officers to provide assistance.[35]

The Delaware Code grants this court the power to appoint special magistrates: "Unless expressly prohibited by a statute pursuant to which a particular cause has

---

[33] *In re Peterson*, 253 U.S. 300, 312 (1920); *see also id.* at 309–10 ("New devices may be used to adapt the ancient institution to present needs and to make of it an efficient instrument in the administration of justice."). *See generally* Wayne D. Brazil, *Referring Discovery Tasks to Special Masters: Is Rule 53 a Source of Authority and Restrictions?*, 8 Am. Bar Found. Rsch. J. 143 (1983).

[34] *See* Irving R. Kaufman, *Masters in the Federal Courts: Rule 53*, 58 Colum. L. Rev. 452, 462 (1958) ("[R]ule 53 was intended merely as a codification of pre-existing procedures, and it may be assumed that references sanctioned by long usage and practice in the federal courts were not intended to be forever foreclosed by the rule."); Elizabeth Montgomery, *Force and Will: An Exploration of the Use of Special Masters to Implement Judicial Decrees*, 52 U. Colo. L. Rev. 105, 111 (1980) ("[Rule 53] embodies the case law that was established by the Supreme Court in *Ex Parte Peterson*.").

[35] *See, e.g.*, *Ruiz v. Estelle*, 679 F.2d 1115, 1161 (5th Cir. 1982) ("[R]ule 53 does not terminate or modify the district court's inherent equitable power to appoint a person, whatever be his title, to assist it in administering a remedy."), *amended and vacated in other part*, 688 F.2d 266 (5th Cir. 1982); *Schwimmer v. U.S.*, 232 F.2d 855, 865 (8th Cir. 1956) ("Beyond the provisions of Rule 53 . . . for appointing and making references to Masters, a Federal District Court has 'the inherent power to supply itself with this instrument for the administration of justice when deemed by it essential.'" (quoting *Peterson*, 253 U.S. at 312)); *Hellebust v. Brownback*, 824 F. Supp. 1524, 1528 (D. Kan. 1993) ("Although this court appoints a receiver under its inherent equitable powers, it is guided by the provisions of Rule 53 . . . ."); *N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 551 F. Supp. 1165, 1178–79 (E.D.N.Y. 1982) (noting that "[t]he court has always had the equity power to fashion the relief necessary to protect its judgment against future violations" and that it "need not rely solely on Rule 53 for its equity power to provide itself with the appropriate instrument to enforce its decree."), *rev'd in part, aff'd in relevant part*, 706 F.2d 956 (2d Cir. 1983).

been initiated in the Court of Chancery, the Court of Chancery may, in any cause

pending in the Court of Chancery of this State, appoint a Magistrate in Chancery,

pro hac vice."[36] Court of Chancery Rule 135 implements that authority by stating that

"[t]he Court shall have authority in any cause pending in the Court of Chancery of

this State to appoint a Magistrate in Chancery pro hac vice in such particular

cause."[37] Court of Chancery Rule 136 authorizes a magistrate to wield broad powers:

> The Magistrate in Chancery shall regulate all the proceedings in every hearing before the Magistrate in Chancery upon every order of reference. The Magistrate in Chancery shall have full authority to administer all oaths in the discharge of the Magistrate in Chancery's official duties; to examine the parties and witnesses in the cause upon oath touching all matters contained in the order of reference; to summon and enforce the attendance of witnesses; to require the production of all books, papers, writings, vouchers and other documents applicable thereto; to cause such evidence to be taken down in writing; to order the examination of other witnesses to be taken under a commission to be issued upon the Magistrate in Chancery's certificate from the office of the Register in Chancery, or by deposition; to certify to testimony taken; to direct the mode in which the matters requiring evidence shall be proved before the Magistrate in Chancery; to grant adjournments and extensions of time; and generally to do all other acts, and direct all other inquiries and proceedings in the matters before the Magistrate in Chancery, which may be deemed necessary and proper, subject at all times to the revision and control of the Court.[38]

Court of Chancery Rule 145 specifically authorizes the court to direct a party to

produce books, papers, or writings before a magistrate and to provide the magistrate

---

[36] 10 *Del. C.* § 372(a).

[37] Ct. Ch. R. 135.

[38] Ct. Ch. R. 136.

with discretion over what books, papers, or writings are to be produced.[39] The Court of Chancery has previously appointed special magistrates to review documents *in camera*.[40]

Taken together, these authorities make clear that the court can appoint a special magistrate to conduct an *in camera* review of Grinnell and Petigrow's withheld documents, prepare a listing of Unrelated-Party Work, and prepare a privilege log for Related-Party Work. Just as the court could conduct an *in camera* review and perform those tasks itself, so can a special magistrate acting as an arm of the court.

Having established that the power exists, the next question is whether the court should exercise it. In theory, now that their objections have been resolved, Grinnell and Petigrow could prepare the listing for the Unrelated-Party Work and the privilege log for the Related-Party Work. But this case has already been plagued

---

[39] Ct. Ch. R. 145.

[40] *See In re Cellular Tel. P'ship Litig.*, 2017 WL 3769202, at *2 (Del. Ch. Aug. 29, 2017) (empowering special discovery magistrate to review documents *in camera*); *Pontone v. Milso Indus. Corp.*, 2014 WL 2439973, at * 17 (Del. Ch. May 29, 2014) (reviewing privilege determination by special magistrate who reviewed documents *in camera*); *King v. Deloitte LLP*, 2010 WL 3489735, at *5 (Del. Ch. Sept. 7, 2010) (suggesting "*in camera* review by the Court of a Special [Magistrate] may be the most efficient solution" for discovery disputes); *NACCO, Indus., Inc. v. Applica Inc.*, 2010 WL 3220676, at *1 (Del. Ch. Aug. 10, 2010) (considering "appoint[ing] a Special [Magistrate] to review some quantum of documents *in camera* . . .."); *SICPA Hldgs. S.A. v. Optical Coating Lab'y, Inc.*, 1996 WL 577143, at *4 (Del. Ch. Sept. 23, 1996) (Allen, C.) (appointing special magistrate to conduct *in camera* review); *Darnielle v. Santa Fe Indus., Inc.*, 1980 WL 268074, at *1 (Del. Ch. Oct. 9, 1980) ("[T]he most efficacious way to move this case forward is for a special [magistrate] to be appointed to examine such documents *in camera* . . . .").

by discovery problems. Grinnell and Petigrow have obstinately resisted discovery. Grinnell has been particularly recalcitrant, refusing even to run the search strings that Petigrow ran. If Petigrow and Grinnell prepare the listing of Unrelated-Party Work and privilege log for Related-Party Work in the first instance, then the court can look forward to disputes about the adequacy and reliability of their submissions. Empowering a special magistrate to prepare those documents should eliminate a round of disputes.

The final question is whom to appoint. Petigrow and Grinnell have asked the court to appoint a retired New Jersey judge on the theory that New Jersey applies a special set of rules that are particularly protective of client identities and privileged communications. From my review of the case law, that does not appear to be true. The only support that Petigrow and Grinnell offer is the *Evolution* case, which looks more like a cautious, fact-specific decision than a departure from the main body of American law. In addition to being unnecessary for the substantive review, appointing a retired New Jersey judge would inject additional delay and expense. The parties would have to locate candidates, the court would have to select one, and the candidate would have to get up to speed.

In the person of the Discovery Facilitator, the court already has access to a neutral who is familiar with this matter, knows the parties, and understands how discovery has unfolded to date. The Discovery Facilitator is also familiar with this court's expectations for privilege logs. He can immediately take on the additional tasks of preparing the listing for the Unrelated-Party Work and the privilege log for

the Related-Party Work. The court will therefore empower the Discovery Facilitator to act as a special magistrate to perform those tasks.

To further protect Petigrow and Grinnell's interests, as well as the interests of their clients, the court will enter an order under Rule 510(f) which provides that (i) the production of information to the Special Magistrate and (ii) the preparation and distribution by the Special Magistrate of the Unrelated-Party Work listing and the Related-Party Work privilege log will not effectuate any waiver of privilege.[41]

## E.    Next Steps

The Discovery Facilitator will submit a form of order empowering him to act as the Special Magistrate and providing for Rule 510(f) protection. Within one week after the entry of that order, Petigrow and Grinnell must each provide a copy of the documents they have withheld to the Special Magistrate, along with a load file containing at least the following metadata fields, plus any additional fields that the Special Magistrate directs:

- ALL CUSTODIANS

- AUTHOR [for non-email electronic documents]

- FROM

- TO

---

[41] D.R.E. 510(f) ("Notwithstanding anything in these rules to the contrary, a court may order that the privilege or protection is not waived by disclosure connected with the litigation pending before the court—in which event the disclosure is also not a waiver in any other proceeding."); *see Cellular Tel. P'ship Litig.*, 2017 WL 3769202, at *1 (authorizing special discovery magistrate to review documents *in camera* without waiving privilege).

- CC

- BCC

- SUBJECT

- FILENAME [for non-email electronic documents]

- FILETYPE

- BATES NUMBER

- TITLE

- CREATED DATE/SENT DATE

- PRIV_TYPE

- PRIOR ADDITIONAL RECIPIENTS

- THREAD GROUP

The Special Magistrate may specify the file format.

The Special Magistrate will run the back-end search strings on Petigrow and Grinnell's documents and provide the hit reports to all parties.

The Special Magistrate will identify the clients for Unrelated-Party Work. He will prepare and produce to all parties a list disclosing the number of clients for Unrelated-Party Work, the number of communications with each client, and the date and number of pages of each communication. Absent further order from the court, the Special Magistrate will not disclose any other information regarding Unrelated-Party Work.

The Special Magistrate will treat the remaining documents as involving Related-Party Work. He will prepare and produce to all parties a privilege log for

those matters. Absent further order from the court, the Special Magistrate will not disclose any other information regarding Related-Party Work.

Grinnell and Petigrow will each bear half of the fees and expenses incurred by the Special Magistrate.

### III.    CONCLUSION

The plaintiffs' motion for appointment of a neutral is granted. The parties will proceed in accordance with this decision.